**In re BICOASTAL CORPORATION, f/k/a the Singer Company, Debtor.**

**Bankruptcy No. 89–8191–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 15, 1992.

Harley E. Riedel, Donald E. Engle, Robert H. Wheeler, for debtor.

William Goldman, Dykema Gossett, for Unsecured Creditors Committee.

Sipser, Weinstock, Harper & Dorn, for Singer Retirees Action Committee.

James Gresser, Dept. of Justice, Civil Division, for U.S.

John Patrick, Jr., U.S. Attys. Office, for U.S.

David A. Drabkin, for the Defense Logistics Agency, DCASR NY–HG.

Kenneth Nagle, for the Defense Logistics Agency, DCASR Atlanta.

## ORDER ON MOTIONS TO DETERMINE GOVERNMENT'S INTEREST IN DEBTOR'S REVERSIONARY INTEREST IN PENSION PLANS

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 11 reorganization case. The matters under consideration are a motion filed by the United States of America (Government) on behalf of its agency, the Defense Logistics Agency (DLA), which seeks an order determining 1) that DLA has an equitable interest in the reversionary interest of Bicoastal Corporation, f/k/a The Singer Company, (Debtor) in certain of its overfunded pension plans; 2) that the Debtor's interest in the reversionary interest in the overfunded pension plans is not property of the estate by virtue of § 541(d); or 3) that, in the alternative, even if it is property of the estate, the Government has an enforceable *in rem* interest in the monies which ultimately represent the Debtor's reversionary interest in its overfunded pension plans. The Debtor, in its response, contends that its reversionary interest is property of the estate and denies that the Government acquired an *in rem* property interest in the Debtor's reversionary interest in assets held in the Debtor's qualified pension and profit sharing plans. Alternatively, the Debtor contends that any interest of the DLA in the reversionary interest is inferior to the interest of the Debtor–in–Possession. The facts which are relevant to the controversy under consideration as they appear from the record and which are without dispute and can be summarized as follows:

The Debtor, the predecessor-in-interest of The Singer Company (Singer), was formerly engaged in the defense contract business and had numerous contracts with the DLA. The contracts between the Debtor and the DLA were subject to the Federal Acquisition Regulations (FAR) and the Cost Accounting Standards (CAS). These contracts were either fixed-priced or flexibly-priced contracts. Under the fixed-priced contracts, the Debtor agreed to produce a specific product for a fixed price for the Government, and the Debtor alone was to bear the burden of cost overruns or enjoy the benefits of cost underruns. Under a flexibly-priced contract, the profits or losses were to be shared by the Debtor and the Government based on a percentage established by negotiations.

The Debtor maintained qualified pension plans pursuant to the provisions of the Employee Retirement Income Security Act (ERISA). These plans have not been terminated in accordance with ERISA, which provides the exclusive method for termination. *See* 29 U.S.C. § 1341(a)(1). Under ERISA, except upon termination, the assets of the pension plans "shall never inure to the benefit of any employer and shall be held for the *exclusive* purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1). The termination date of the pension plans is governed by 29 U.S.C. § 1348, and depends on the occurrence of certain events, which have yet to occur.

Sometime in early 1988, the Debtor incorporated its several operating divisions, and during July, August, and October of 1988, the Debtor sold the stock in eight of its

nine major subsidiaries. On the date of the sale of the stock in the subsidiaries, the pension plans retained by the Debtor were effectively frozen. No new employees could enter the pension plans, and the interest of the employees who were participating in the plans became fully vested as of that date. The purchasers of the stock in the subsidiaries established new pension plans to cover the former employees of Singer who became employees of the corporations who acquired controlling interest in the corporations from the date of the stock purchase forward. As a result, the white collar employees, formerly employed by the Debtor, became participants in two qualified pension plans, one previously maintained by the Debtor which became frozen, and the other established by the purchasers of the stock in the subsidiaries.

Soon after the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, it filed a Motion and sought authority of this Court to merge the pension plans for its former subsidiaries, which plans the Debtor retained after the stock sale, with a pension plan for certain retired employees which the debtor also retained. It is without dispute that the pension plans of the Debtor's former subsidiaries were overfunded. The Debtor sought to eliminate this overfunding by merging these plans with the pension plan it retained for certain retirees, which plan the Debtor intentionally underfunded. This Court authorized the merger, in part because of the tax benefits to the Debtor, and in part because of the assurances of the Debtor that separate records would be maintained for each pension plan. The District Court reversed this Court and remanded the issue back to this Court, in part to determine the nature and extent of the Government's interest in the Debtor's reversionary interest in the overfunded portion of the pension plans.

The issue of whether the sale of the stock in the Debtor's former subsidiaries operated as a "segment closing" and in turn triggered the provisions of CAS was litigated earlier and was resolved in favor of the Government by an Order entered by this Court on January 23, 1991. In its Order, this Court held that the sale of the stock did operate as a "segment closing" which, in turn, triggered the applicability of the provisions of 48 C.F.R., 31.201–5. This regulation, which was in effect when the "segment closings" occurred, provides:

> The applicable portion of any income rebate, allowance, or other credit relating to any allowable cost and received by or accruing to the contractor shall be credited to the government either as a *cost reduction* or a *cash refund.* (emphasis added)

■ It should be noted that pursuant to FAR 31.201–5, the Government can get a credit of either a cost reduction or a cash refund. After the "segment closings" occurred in July, August, and October, 1988, § 31.201–5 of FAR was amended and renumbered as FAR 31.205(6)(j)(4), effective on September 21, 1989. *See Fed.Reg. 34750 (1989).* The amended version entitled "Termination of Defined Benefit Pension Plans," provides:

> When excess or surplus assets revert to the contractor as a result of termination of a defined benefit pension plan, or such assets are constructively received by it for any reason, the contractor shall make a refund or give a credit to the Government for its *equitable share.*

This Court is satisfied that FAR 31.201–5, which was in effect when the "segment closings" occurred, governs this controversy rather than, as contested by the Government, the amended FAR 31.205(6)(j)(4), which took effect one year after the last "segment closing." This is so because it is clear that contracts are governed by the regulations in effect when the contracts were executed, or at the latest when the segments were closed. *Lockheed–Georgia Co.,* ASBCA No. 27660 90–3 BCA ¶ 22957 at 115,273, 1990 WL 133163; *Franklin W. Peters & Assoc.,* IBCA No. 762–1–69, 71–1 BCA ¶ 8615, 1970 WL 837 (1970).

The Government concedes that FAR 31.-205(6)(j)(4) took effect on September 21, 1989, or almost one year after the sale transactions under consideration; however, the Government contends that its claim to the "equitable share" in the qualified pen-

sion fund surplus has its source in FAR 31.201–5, which was in effect on the date of the sale of the Debtor's stock interest in its former subsidiaries. This Court is constrained to reject this proposition outright. A literal reading of FAR 31.205–5 provides two specific alternative remedies to the Government upon the termination of a defined pension plan. Simply stated, upon such termination, the Government is entitled to either a cost reduction against future contacts or a cash refund. It is clear that the remedy of cost reduction is no longer available under the present circumstances inasmuch as the Debtor is no longer performing Government contracts. Thus, the only other remedy for the Government is a cash refund, if, in fact, the Debtor has a revisionary interest in this qualified pension plan upon termination.

■ This Court adopts the rule of statutory construction which stands for the proposition that one must look to the clear and unmistakable language of the statute in determining its meaning. The Court in *United States v. Ron Pair Enterprises,* 489 U.S. 235, 240, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290, 298 (1989), stated, "[a]s long as the statutory scheme is coherent and consistent there is generally no need for a court to inquire beyond the plain language of the statute." In applying this principle, it is clear that FAR 301.205–5 did not create either an ownership interest or an *in rem* interest in the reversionary interest of the Debtor in its qualified pension plans, nor did it create some other right for the government which is superior to the interest of the Debtor in its reversionary interest. This Court acknowledges that FAR 31.205(6)(j)(4) provides for the first time a remedy for the Government which purports to grant an "equitable share" in such overfunding; however, one should not attribute by inference a meaning which is not expressed by the language used. *Ron Pair, supra.* In this case, 41 C.F.R. 31.-205(6)(j)(4) does not apply and thus, the Government cannot rely on the grant of "equitable share" in the Debtor's reversionary interest by the amendment.

■ Even a cursory analysis of 41 C.F.R. 31.205(5) leaves no doubt that the cash refund provided by this section of FAR is nothing more than a grant to the Government to receive a cash refund. It needs no elaborate discussion to support the proposition that the right to receive a cash refund is really nothing more than a right to payment, which is precisely the definition of a "claim" as set forth in § 101(5) of the Bankruptcy Code. Moreover, a right to payment, or a claim, is inconsistent with the concept of ownership. In this connection, it should be noted that the Government did, in fact, file a proof of claim in the Debtor's Chapter 11 case. The claim filed by the Government was filed as an unsecured claim, and the Government never filed a Complaint seeking a determination that the right of the Government is higher than that of an unsecured creditor. Further, the Government did not file a Complaint asserting that the Debtor's interest in the reversionary interest in the overfunded portion of the pension plans does not constitute property of the Debtor's estate, or is subject to a claim which is superior to the Debtor's interest.

■ The initial inquiry, of course, must be directed to the question whether the Debtor's reversionary interest in its qualified pension plan is property of the estate. The concept of "property of the estate" is dealt with in § 541(a) of the Bankruptcy Code, which provides as follows,

§ 541. Property of the estate.

(a) The commencement of a case section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

One of the exceptions to § 541(a) is found in § 541(b)(1), which provides as follows:

§ 541. Property of the estate.

.    .    .    .    .

(b) Property of the estate does not include—

(1) any power that the debtor may only exercise solely for the benefit of an entity other than the debtor;

. . . . .

In considering the threshold issue of whether the Debtor's revisionary interest is property of the estate, it should be helpful to consider legislation which was enacted by Congress to protect the Government's interest concerning Government contracts. Thus, a brief analysis of 41 U.S.C. § 112(e) should be instructive. This statute provides, inter alia, that title to all materials purchased by a contractor which are to be used in the performance of a Government war contract is vested in the Government. Thus, it is apparent that if Congress intended to ensure that the interest of the Government shall be fully safeguarded in connection with contracts it enters into with private entities, Congress would do so in a clear and an unmistakable fashion. Congress did not do so in a case where the Government's claim relates to alleged overfunding of pension plans through Government contracts. This supports the conclusion that the Debtor's reversionary interest in the overfunded pension plans is property of the estate, unless § 541(b)(1) of the Bankruptcy Code applies. This section exempts from properties of the estate properties in which the Debtor merely holds a true legal title and holds the property in trust for beneficiaries of the trust.

Considering the trust theory, it is clear there was never an express trust created by the contract concerning the Debtor's reversionary interest in which the Government was intended to be the beneficiary of the trust. The only other alternatives which might warrant a finding that the Government has an interest superior to that of the Debtor in the reversionary interest is that the reversionary interest is impressed by either a constructive or resulting trust in favor of the Government based on the applicable provisions of FAR and CAS.

■ A resulting trust arises by operation of law and reflects the true intent of the parties. *Doing v. Riley*, 176 F.2d 449 (5th Cir.1949). There is nothing in this record which would warrant the conclusion that the parties, in fact, intended that the Government shall have a proprietary interest or an *in rem* interest in reversionary interest of the overfunded pension plans.

■ A constructive trust is created to correct a wrong or a fraud committed. *Yawn v. Blackwell*, 343 So.2d 906 (Fla. 3d DCA 1977); *Doing v. Riley, supra.* Clearly, there has been no fraud in this instance; instead, the parties merely have a dispute as to the nature of each parties' entitlement to any reversionary interest in the Debtor's pension plans. In short, any reversionary interest in the Debtor's pension plans cannot be said to be held in a resulting trust for the Government.

■ Having concluded that the surplus assets representing the Debtor's interest in the overfunded pension plans do not fall within the exceptions of § 541(b)(1), this leaves for consideration the alternative theory, advanced by the Government, albeit not well articulated, that the interest in the overfunded portion is impressed with some type of lien or any unspecified *in rem* interest which is superior to any interest of the Debtor in the reversionary interest of the pension plans. This proposition urged by the Government is equally without merit. First, there is no contractual agreement which granted to the Government a lien on the overfunded portion of the pension plans. Second, there is no judicial fiat which created a judicial lien on the overfunded portion which is enforceable against the Debtor's interest. This leaves for consideration the last possibility, which is that the lien claimed is like a statutory lien created by FAR § 31.205–5.

Congress has never looked favorably on statutory liens. Section 545 of the Bankruptcy Code specifically authorizes the Trustee to avoid the fixing of statutory liens on properties of the estate. Further, § 545(2) provides that a lien is unenforceable and avoidable if it was not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser that purchased such property at the time of the commencement of the case,

whether or not such purchaser actually exists.

Assuming for the purpose of discussion that the regulations set forth in FAR and CAS could be construed to be a source of a statutory lien by merely implementing the statutes dealing with Government contracts, it is clear that such lien could not survive in bankruptcy for several reasons. First, such lien would not be superior to the interest of any bona fide purchaser of property of the estate by virtue of § 545(2) and, most importantly, the Trustee, by utilizing the strong arm power granted by § 544, clearly would defeat any imperfected lien of the Government. There is no question that the Debtor could have assigned as collateral its interest in the overfunded pension plans, and in this instance, the assignee or a secured party would be in the position of a bona fide purchaser whose interests would be superior to any interest the Government might have acquired by virtue of FAR § 31.205(j)(4). Equally, a judgment lien creditor of the Debtor who acquired the judgment lien of all properties of the Debtor, whether or not such judgment creditor exists, would have a superior position superior to any interest asserted by the Government by virtue of § 544 of the Bankruptcy Code.

Thus, this Court is satisfied that § 31.-205–5 of FAR did not grant to the Government either a proprietary interest or a valid lien interest in the reversionary interest of the pension plans. In sum, the Government's right is limited to file and have an allowed proof of claim to the extent of the overfunding of any of the pension plans involved here. Based on the foregoing it is

ORDERED, ADJUDGED AND DECREED that the Motion to Determine Interest be, and the same is hereby, granted and it is further

ORDERED, ADJUDGED AND DECREED that the United States of America did not acquire an *in rem* ownership or lien interest in the overfunded portion of any of the pension plans maintained by the Debtor prior to the "segment closing". It is further

ORDERED, ADJUDGED AND DECREED that whatever amount will ultimately be recognized as the Government's claim based on overfunding of pension plans shall be allowed only as a general unsecured claim. It is further

ORDERED, ADJUDGED AND DECREED that the final evidentiary hearing shall be scheduled to determine the amount of overfunding in any of the pension plans before the undersigned on March 31, 1992 at 9:00 am at Courtroom A, 4921 Memorial Highway, Tampa, Florida 33634.

DONE AND ORDERED.